IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>MOUNTAIN AMERICA FEDERAL CREDIT UNION, located at 9800 South Monroe, Sandy, UT 84070 | Case No. 2:23mj265-DAO |

**AFFIDAVIT IN SUPPORT OF APPLICATION UNDER
RULE 41 FOR WARRANTS TO SEARCH AND SEIZE**

I, Stephen Lamb, being duly sworn upon oath, hereby declare as follows:

### I. INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search and seizure of bank records currently in the possession of Mountain America Federal Credit Union ("MACU") relating to certain accounts that are connected to a charged scheme and artifice to defraud in the case of *United States v. April Bawden, et al.,* case number 2:22-cr-00481-CW, pending in the United States District Court for the District of Utah.

2. I am currently employed as a Special Agent with the United States Food and Drug Administration-Office of Criminal Investigation (FDA-OCI). I am assigned to the Salt Lake City Domicile Office. I have been a Special Agent with FDA-OCI since December of 2019. Prior to my employment with the FDA-OCI, I was a Special Agent with the United States Secret Service from December 2015, to August 2018, and was responsible for investigating crimes related to our nation's financial system. I was also employed as an Agent for the Oklahoma Bureau of Narcotics for the periods of January 2013, to January 2015, and August 2018, to November 2019. In this position, I was responsible for investigating violations of title 63 of Oklahoma state

statutes, concerning controlled and dangerous substances. I have received criminal investigator training at the United States Secret Service Academy in Beltsville, Maryland, and completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. In my current position with the FDA-OCI, I am responsible for investigating violations of the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., and other associated federal statutes to include 18 U.S.C violations.

3.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other officers, agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

## II. JURISDICTION

4.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## III. IDENTIFICATION OF PREMISES TO BE SEARCHED

5.  I make this affidavit in support of an application for a warrant to search the following premises:

> **MOUNTAIN AMERICA FEDERAL CREDIT UNION, located at 9800 South Monroe, Sandy, UT 84070, (hereinafter, "MACU")**

as described in Attachment A hereto, for evidence, fruits, and instrumentalities of criminal offenses, including but not limited to, violations of 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1957 (Money Laundering); 18 U.S.C. § 1343 (Conspiracy to Commit Wire Fraud, and Wire

2

Fraud), and 18 U.S.C. § 1028A (Aggravated Identity Theft). As set forth below, I have probable cause to believe that such property and items, as described in Attachment B, are currently located at the premises.

## IV. <u>PROBABLE CAUSE</u>

6. On December 7, 2022, a federal grand jury returned an indictment in case number 2:22-cr-00481-CW charging defendant APRIL BAWDEN, and eight (8) other defendants (hereinafter, the "charged defendants"), with violations of 18 U.S.C. § 1344 (Conspiracy to Commit Bank Fraud), 18 U.S.C. § 1343 (Conspiracy to Commit Wire Fraud, and Wire Fraud), 18 U.S.C. § 1957 (Conspiracy to Commit Money Laundering), and 18 U.S.C. § 1028A (Aggravated Identity Theft).

7. The criminal violations charged in the indictment are predicated on the charged defendants' participation in interrelated fraud and money laundering conspiracies to obtain more than $100,000,000 of credit and debit card processing from financial institutions and payment processors. The charged conspiracies took place over a period of almost six years and continued through at least April 2022.

8. The scheme involved the sale of nutraceutical, CBD, and dietary supplement products to consumers through a number of websites and a call center operating in Utah. All of the sales required the consumer to provide a credit or debit card, which card was billed through a credit or debit card processing transaction.

9. The nutraceutical, CBD, and dietary supplement products were advertised to consumers as providing benefits such as weight loss and the treatment of seizures, cancers, and erectile dysfunction, and included false claims about the products' effectiveness and false

celebrity endorsements. Consumers were also misled about the price of products and the ability to return or to obtain a refund for the product.

10. The sale of nutraceutical, CBD, or dietary supplement products is considered high risk for financial institutions and payment processors who process credit card transactions ("Merchant Processors") because of the large numbers of chargebacks, liability associated with consumer use of the products, potential false marketing often associated with these products, the potential of facilitating or funding criminal activity, and potential reputational and financial harm to the Merchant Processor. Merchant Processors attempt to limit their risk and liability in relation to these types of high-risk businesses by engaging in underwriting and other practices before and after a merchant account is opened.

11. In an effort to avoid the risk-mitigating actions taken by Merchant Processors and to facilitate the tens of thousands of misleading online sales transactions to acquire more than $100,000,000, the charged defendants, with the assistance of others, set up hundreds of sham limited liability companies (LLCs), created and used hundreds of false and misleading websites to act as "false storefronts" for the sham LLCs, and set up hundreds of business checking accounts and merchant processing accounts in the names of others, but which the charged defendants controlled. The charged defendants recruited and paid individuals (herein "straw owners") for the use of their personal information to create the sham LLCs, and open business checking accounts and merchant processing accounts for the sham LLCs through which the charged defendants processed the sales of their products and transferred the proceeds to benefit themselves and others involved in the scheme.

12. APRIL BAWDEN was one of the charged defendants who recruited straw owners for the purpose of creating sham LLCs, and opening business checking accounts and merchant processing accounts for the sham LLCs.

13. As part of the scheme, the charged defendants regularly manipulated sales transactions to keep the merchant accounts for the sham LLCs open as long as possible. Merchant accounts were suspended or closed by Merchant Processors when the percentage of transactions resulting in chargebacks was too high. The charged defendants conducted thousands of false sales transactions using prepaid gift cards to lower the chargeback rate in an effort to keep the merchant accounts open. The charged defendants referred to these false sales transactions as "friendlies." A typical "friendly" transaction involved the use of a prepaid gift card for a low dollar "sale" of a product. The consumer information for the "sale" was falsified and no product was shipped or provided to anyone.

14. In addition, as part of the scheme, the charged defendants customized and used a customer relationship management software program ("CRM") to further and to conceal the scheme. Specifically, the CRM aided the charged defendants by distributing sales of products across multiple merchant accounts in the names of the sham LLCs. The CRM was also designed to aid in the processing of "friendly" transactions. The CRM was modified to inform the charged defendants when a sale of product was attempted or made through one of the false storefront websites submitted to Merchant Processors so the charged defendants could take additional steps to conceal their scheme. The CRM was also modified to allow the charged defendants to manipulate the on-line websites through which they made sales to consumers. Specifically, the CRM allowed the charged defendants to "hide" pricing and subscription information so that consumers were not able to see that, by purchasing a product on the website, they were

automatically enrolled in a subscription service that charged their credit and debit cards on a recurring basis.

15. The charged defendants used Target Fulfillment LLC as the entity that fulfilled and managed the sales of the products in the scheme. Target Fulfillment LLC processed the sales orders from consumers and used the CRM to distribute sales across multiple merchant accounts to further and conceal the scheme. In addition, bank accounts controlled by Target Fulfillment LLC were used to "layer" proceeds from the scheme to benefit the charged defendants.

16. The charged defendants also used Total Client Connect, DBA Elite Business Resources LLC, as the entity through which the charged defendants operated a call center in Utah that was designed to further the scheme. APRIL BAWDEN and CHAD BAWDEN controlled Total Client Connect.

17. It was also a part of the scheme for one of the charged defendants to be a co-signor on the business checking accounts for each of the sham LLCs. This enabled the defendants access to and control of the proceeds from the scheme.

18. Evidence about the above-described scheme, how it worked, and the involvement of the charged defendants, to include APRIL BAWDEN, was obtained by law enforcement from, among other things, the following: (1) interviews with more than twenty (20) of the straw owners; (2) the review of hundreds of merchant processing account applications; (3) the review of thousands of electronic records and communications between the charged defendants, which was obtained from the execution of a Google search warrant in 2022; (4) interviews with multiple employees who worked for the charged defendants and/or business entities involved in the scheme to include Target Fulfillment LLC and Total Client Connect; (5) interviews with

participants in the scheme, to include several charged defendants, and uncharged individuals; and (6) the review of thousands of pages of bank records from hundreds of bank accounts.

19. The straw owners consistently reported to law enforcement that they were recruited by a charged defendant(s) to open a sham LLC for the purpose of allowing the charged defendants to use the sham LLC to sell products. The straw owners signed paperwork to open a bank account for the sham LLC, but control of that bank account was given to one of the charged defendants. The straw owners were paid a nominal amount, usually $250-$350/month, as long as their merchant account remained open. The straw owners did nothing to operate the businesses, made no decisions related to the businesses, and had little to no knowledge of the businesses. In addition, when shown applications to open merchant processing accounts and corporate agreements that they purportedly signed, numerous straw owners reported that they never signed, authorized, or had any knowledge about the documents.

20. In March 2023, I spoke with a representative of MACU. The representative confirmed that MACU had a number of open business checking accounts in the names of LLCs for which APRIL BAWDEN was listed as a co-signor on the accounts. (The MACU representative informed me that, instead of the term co-signore, the term MACU uses is a "partner" on the account.) Each of the business accounts are in the names of LLCs that purportedly are controlled by someone other than APRIL BAWDEN. Each of the business accounts was involved in payment processing. Some of the accounts have a negative balance, and some have a balance in the thousands of dollars. The MACU representative advised the government that they became aware of APRIL BAWDEN's involvement when they contacted the purported owners of the accounts with negative balances, and were advised that APRIL BAWDEN managed the accounts.

21.    Based on my training and experience, and my knowledge of the facts of this case, I respectfully submit that there is probable cause to believe that MACU has records and other evidence of business accounts in the name of sham LLCs that were part of the charged schemes to defraud.

## V. CONCLUSION

22.    I submit that this affidavit supports probable cause for a search warrant authorizing the search of the premises described in Attachment A to obtain the items described in Attachment B.

23.    I further submit that the presence of a law enforcement officer is not required for the service or execution of the warrant on MACU. The government will execute this warrant by serving the warrant on MACU. Because the warrant will be served on MACU, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

*Stephen Lamb* (signature)
Stephen Lamb, Affiant
Special Agent, Food and Drug Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1.

*Daphne A. Oberg* (signature)
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

### **Property to Be Searched**

Business address:    Mountain America Federal Credit Union

9800 South Monroe

Sandy, UT 84070

This warrant applies to the records, communications, and other tangible items that are stored at premises owned, maintained, controlled, or operated by Mountain America Federal Credit Union, located at 9800 South Monroe, Sandy, UT 84070 as described in Attachment B.

# ATTACHMENT B

All records pertaining to any and all accounts for which APRIL BAWDEN had signatory authority and/or the right of withdrawal, whether held jointly or severally, for the time period January 2016 through the present.

These records should include but are not limited to:

COMMUNICATIONS: All correspondence with the above person/entities and/or with third parties regarding the above persons/entities. All memoranda, notes, files, or records relating to meetings or conversations concerning the above persons/entities. All recorded conversations, call logs, electronic communications related to the account(s). All internal notes maintained related to communications with individuals involved in the account(s). All communications maintained regarding system red flag warnings or notices.

SAVINGS ACCOUNT RECORDS: Including signature cards, applications, customer identification, bank statements, ledger cards or records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, checks deposited, withdrawal slips, and checks issued for withdrawals.

CHECKING ACCOUNT RECORDS: Including signature cards, applications, customer identification, bank statements, deposit slips, checks deposited, checks drawn on the account (front and back), records pertaining to all debit and credit memos or cash withdrawals.

MERCHANT ACCOUNT/PAYMENT PROCESSING: Including signature cards, applications, statements, chargebacks, and records of deposits, transfers, or withdrawals relating to payment processing services.

SECURITIES RECORDS: Including signature cards, statements, deposited items, wire requests/confirmations/approvals, debit items, canceled checks, securities holdings, trade requests and confirmations.

LOAN RECORDS: Including applications, financial statements, loan collateral, credit and background investigations, loan agreements, notes or mortgages, settlement sheets, contracts, checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loan correspondence files, and internal bank memoranda.

CREDIT CARD RECORDS: Including customer's application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and method (cash or check) of repayment, checks used to make repayments (front and back).

PURCHASES OF BANK CHECKS: Purchases of bank checks, cashier, teller, travelers' check records, or money order records including the check register, file copies of the checks or money orders, records revealing the date and source of payment for said checks or money orders.

OTHER RECORDS: Records of certified checks, wire transfers, or collections, letters of credit, bonds and securities purchased through your bank, savings bond transactions and investment accounts. Such records that disclose the date and amount of the transaction, method (cash or check) and source of payment, instruments, and statements of transactions.

**RECORD FORMAT: Please provide the required documents in electronic format. If available, please provide statement information in a format that can be exported into Microsoft Excel.**